## IN THE COURT OF COMMON PLEAS FOR THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE         )
)
)
v.              )
)
)    Cr. A. No. 1405001614
RICHARD L. TEW,         )
)
)
Defendant.       )

Submitted: June 9, 2015
Decided: July 6, 2015

Christopher Marques, Esquire
Deputy Attorney General
Delaware Department of Justice
820 N. French Street, 7th Floor
Wilmington, DE 19801
*Attorney for the State*

James L. Natalie, Esquire
Woloshin, Lynch, Natalie & Gagne, P.A.
1823 W. 16th Street
Wilmington, DE 19806
*Attorney for Defendant*

## DECISION ON DEFENDANT'S MOTION TO SUPPRESS

RENNIE, J.

Defendant Richard L. Tew ("Tew") stands charged with Driving Under the Influence of Alcohol ("DUI"), in violation of 21 *Del. C.* § 4177(a), following a stop at a DUI Sobriety Checkpoint (the "Checkpoint") on May 3, 2014. Tew moves to suppress all evidence gathered by the Delaware State Police. He contends that the Checkpoint was not established pursuant to the Checkpoint Strikeforce Sobriety Checkpoint Procedures ("Checkpoint Procedures") adopted by the State, and therefore, fails to comply with Article 1, Section 6 of the Delaware Constitution and the Fourth Amendment of the United States Constitution. The Court heard Tew's motion on June 2, 2015 and took the matter under advisement. This is the Court's Opinion on Tew's requested relief.

## FACTS

Chief Michael Capriglione ("Chief Capriglione") testified on behalf of the State.[1] Delaware's Checkpoint Strikeforce was established for the purpose of curbing the amount of accidents and fatalities resulting from incidents of impaired driving. To ensure that its checkpoints comply with the Fourth Amendment and Article 1, Section 6 of the Delaware Constitution, the State adopted the Checkpoint Procedures.[2]

On April 24, 2014, pursuant to the Checkpoint Procedures, Chief Capriglione requested approval from Lisa Shaw ("Shaw"), the Deputy Director of the Office of Highway Safety ("OHS") to establish and conduct a checkpoint at the intersection of Papermill Road and Winterthur Lane on May 2, 2014 from 10:00 p.m. to 2:00 a.m.[3] Chief Capriglione testified that the proposed location of the checkpoint must meet one of four statistical requirements set forth in

---

[1] Chief Capriglione has been a police officer since 1976. He joined the Checkpoint Strikeforce at its inception in 2003. The Court finds Chief Capriglione to be a credible witness.
[2] *See* State's Ex. 1.
[3] State's Ex. 2.

the Checkpoint Procedures to be approved.[4] On April 25, 2014, Shaw approved Chief Capriglione's request.[5] Her approval memorandum ("Approval Memorandum") states that a review of the 2012 Delaware State Police Annual Traffic Statistics[6] shows that four impaired driving personal injury collisions and five impaired driving collisions occurred at or near the approved location, satisfying two of the four possible statistical qualifiers.[7] Based on the statistics, the request was approved. However, the approval memorandum provided a checkpoint operation date of "Friday, May 5, 2014" [sic].[8]

On Friday, May 2, 2014, Chief Capriglione supervised the establishment and operation of the Checkpoint, which was set to be established at the intersection of Papermill Road and Winterthur Lane on both sides of Papermill Road. At the hearing, Chief Capriglione testified that due to concerns for officer safety, as well as the need to alert motorists that a stop was imminent, he moved the checkpoint further south on Papermill Road.[9] At 12:28 a.m., Tew was stopped, arrested, and charged with DUI.

**PARTIES' CONTENTIONS**

Tew contends that (1) the Checkpoint was impermissibly operated more than 1,000 feet from its approved location; (2) the Checkpoint was not operated on the date listed in Shaw's Approval Memorandum; and (3) the raw data does not support the establishment of a sobriety checkpoint at the intersection of Papermill Road and Winterthur Lane. According to Tew, these deficiencies cause the Checkpoint to violate Article 1, Section 6 of the Delaware Constitution

---

[4] *See* State's Ex. 1, ¶ 2. The requested location of the checkpoint must meet one of the following criteria in the three most recent years before the date of the request: (1) One or more impaired driving fatal collisions; (2) Three or more impaired driving personal injury collisions; (3) Five or more impaired driving collisions; or (4) 5% or more of the impaired driving citations within the jurisdiction.
[5] *See* State's Ex. 2, Apr. 25, 2014 Memorandum.
[6] *See* State's Ex. 3.
[7] *Id.*
[8] State's Ex. 2, Apr. 25, 2014 Memorandum.
[9] Chief Capriglione estimates that the checkpoint stretched a full city block – or 150 yards – in either direction.

3

and the Fourth Amendment of the United States Constitution. Thus, he argues that any evidence gathered from the Checkpoint should be suppressed.

The State counters that the checkpoint's establishment and operation is in "reasonable compliance" with the Checkpoint Procedures. Specifically, the State argues that the Checkpoint Procedures afford the supervising officer latitude to move the checkpoint out of concern for officer safety, so long as it remains within a reasonable nexus of the approved location. Next, the State argues that a mere clerical error in the date should not negate the validity of the checkpoint. Finally, the State contends that Shaw's approval memorandum and the statistics from which it originates carries the State's burden of showing that the Checkpoint was established in compliance with the Checkpoint Procedures.

## DISCUSSION

On a motion to suppress, the State bears the burden of establishing that the challenged search or seizure comported with the rights guaranteed to Tew by the United States Constitution, the Delaware Constitution, and Delaware statutory law.[10] The burden of proof on a motion to suppress is proof by a preponderance of the evidence.[11]

Stopping a vehicle at a checkpoint constitutes a seizure under the Fourth Amendment of the United States Constitution and Article I, Section 6 of the Delaware Constitution.[12] Whether a seizure is reasonable depends upon "a balance between the public interest and the individual's right to personal security from arbitrary interference by law officers."[13] In evaluating the reasonableness of a sobriety checkpoint, the United States Supreme Court has articulated a test which balances a state's interest in preventing drunk driving and the effectiveness of sobriety

---

[10] *See State v. Matos*, 2001 WL 1398585, at *2 (Del.Super. Aug. 6, 2001).
[11] *Id.*
[12] *See Michigan Dept. of State Police v. Sitz*, 496 U.S. 444 (1990); *Bradley v. State*, 858 A.2d 960, 2004 WL 1964980 (Del. 2004).
[13] *Brown v. Texas*, 443 U.S. 47 (1979).

4

checkpoints as an instrument of prevention versus the level of intrusion on an individual's privacy.[14]

Delaware courts have repeatedly approved the legality and use of sobriety checkpoints.[15] Sobriety checkpoints are reasonable seizures when procedures are in existence to ensure that motorists passing through checkpoints are stopped in a reasonably safe manner and that sufficient safeguards are in place, limiting the discretion of law enforcement officers with respect to the location of each checkpoint and the stopping of vehicles.[16]

Sobriety checkpoints in Delaware are created and operated under certain Delaware OHS Checkpoint Procedures.[17] The Checkpoint Procedures describe the objective criteria used for choosing the location of the checkpoint, the manner of notifying officials and the procedures for operating the checkpoint.[18] The Procedures address, among other things, selection of the location in an attempt to ensure that the checkpoint is established pursuant to a neutral plan and that the discretion of the officers conducting the checkpoint is severely curtailed.[19]

To meet the requirements of reasonableness, the State must demonstrate careful compliance with substantially all of the Guidelines.[20] Above all else, the State must demonstrate careful compliance with those guidelines that limit an officer's discretion to set the location of the checkpoint, or to stop particular motorists during the checkpoint.[21]

---

[14] *Sitz*, 496 U.S. at 455.
[15] *See Bradley v. State*, 858 A.2d 960, 2004 WL 1964980 (Del. 2004); *State v. Cook*, 2013 WL 1092130 (Del. Super. Feb. 13, 2013); *State v. Terry*, 2013 WL 3833085 (Del. Super. Jul. 18, 2013).
[16] *Bradley*, 2004 WL 1964980, at *1. *See also State v. Cook*, 2013 WL 1092130, at *5 (Del. Super. Feb. 13, 2013).
[17] *See State v. McDermott*, 1999 WL 1847364, at *2 (Del. Com. Pl. Apr. 30, 1999).
[18] *Id.*
[19] *Id.*
[20] *Bradley*, 2004 WL 1964980, at *1.
[21] *Id.*

<u>The Checkpoint's Relocation</u>

Tew challenges the Checkpoint's operation. Specifically, he argues that the Checkpoint was not operated at or near its approved location and as a result, the Checkpoint does not comply with the Checkpoint Procedures. His argument is unpersuasive. Delaware recognizes that a supervising officer may move a checkpoint within the area authorized by OHS.[22] According to paragraph three of the Checkpoint Procedures, "[i]f it is unsafe to set up a checkpoint at the precise location or intersection approved, it is permissible to utilize an adjacent roadway that serves as an ingress or egress into the problem area."[23] Additionally, the Checkpoint Procedures allow a location adjustment "to allow approaching traffic ample time to realize that a traffic stop is imminent."[24] On cross-examination, Chief Capriglione was questioned concerning why the location of Tew's arrest was listed as 670 feet south of Winterthur Lane, closer to Odessa Way. Chief Capriglione responded that he moved the Checkpoint out of dual concerns for officer safety and to provide notice to approaching motorists that a stop was imminent. Further, the testimony demonstrated that there were no issues that precluded ingress or egress into the relocated area. Accordingly, the Court finds that Chief Capriglione's relocation of the checkpoint complies with the Checkpoint Procedures.

<u>Date of Checkpoint Operation</u>

Next, Tew argues that the Checkpoint should be invalidated because Chief Capriglione sought approval to operate the Checkpoint on Friday, May 2, 2014; yet it was approved for "Friday, May 5, 2015."[25] On that point, the State presented testimony that although the Approval

---

[22] *See State v. Gonzalez –Ortiz*, 2007 WL 549907 (Del. Com. Pl. Jan. 30, 2007) (holding that based on safety concerns, the supervising officer may move the checkpoint within the area authorized by the Office of Highway Safety).

[23] State's Ex. 1, ¶ 3.

[24] *Id.*

[25] *See* State's Ex. 2.

6

Memorandum states that approval was granted for Friday, May 5, 2014, when viewed in its entirety, it is clear that the State intended to operate the Checkpoint on Friday, May 2, 2014.[26] The Court recognizes that this oversight was a clerical error. Indeed, May 5, 2014 was not a Friday as indicated in the Approval Memorandum. Further, Chief Capriglione testified that OHS sends advance notice of its sobriety checkpoint dates and locations to Delaware's major news outlets two times a week and that the notice of the instant Checkpoint set forth the correct date of Friday, May 2, 2014. Therefore, the Court finds that the clerical error in the approval memorandum does not invalidate the legitimacy of the Checkpoint.

Raw Data

Finally, Tew contends that the raw data does not provide a sound foundation for the establishment of the Checkpoint. For example, on cross examination, Tew's counsel asked Chief Capriglione to review the raw data[27] and identify the incidents on or near the intersection of Papermill Road and Winterthur Lane which satisfied the statistical requirements of the Checkpoint Procedures.[28] Chief Capriglione found references to Papermill Road listed only three times throughout the raw data. Further, the raw data did not identify whether the offenses listed on Papermill Road were in close proximity to the checkpoint's location, what the nature of the offense involved, or its final disposition. Chief Capriglione admitted that there was no way to tell from the raw data alone which of the incidents involved impaired driving.

Further, Lisa Shaw, the person who could testify to the meaning of the raw data, was not present. Recognizing this deficiency, the State argued that Shaw's Approval Memorandum citing

---

[26] State's Ex. 2.
[27] State's Ex. 3.
[28] Chief Capriglione had previously testified that the guidelines require a minimum of three impaired driving collisions; the Approval Memorandum indicated that Papermill Road had five. He also testified that the guidelines require one fatality from an impaired driving collision; the Approval Memorandum indicated that Papermill Road had three.

7

the statistics, coupled with the raw data from which the approval originates, satisfies the State's burden of showing that the statistical requirements support the establishment of the checkpoint. The State's argument is without merit.

The State's argument in this case is analogous to its argument in *State v. Hollinger*, in which this Court found that the State failed to carry its burden of showing that the checkpoint was established pursuant to a neutral plan that limited officer discretion as to its location.[29] In *Hollinger*, the State attempted to prove that the checkpoint and stop of the defendant carefully complied with the statistical requirements of the Checkpoint Procedures. To prove careful compliance, the State presented the testimony of an officer who assisted in the checkpoint's operation. Notably, the State also introduced an exhibit[30] containing, among other things, (1) a memorandum from Shaw to Chief Capriglione granting approval to establish and operate the checkpoint, and (2) raw data containing statistics and information relating to DUI arrests for certain locations throughout Delaware, which the Shaw memorandum purportedly relied on in approving the checkpoint location.[31] In analyzing the weight given to the officer's testimony, the Court in *Hollinger* noted that despite being a credible witness, the officer was "unable to provide substantive testimony regarding anything contained in [State's] exhibit 2," and that his testimony in connection with State's exhibit 2 was "mostly speculative and not overly helpful to the Court" in showing that the checkpoint complied with the Checkpoint Procedures.[32] In granting the defendant's motion to suppress all evidence seized at the checkpoint, the Court noted that State's

---

[29] 2012 WL 5208792, at *7-8 (Del. Com. Pl. Oct. 10, 2010).
[30] Identified as "State's Exhibit 2."
[31] *Id.* at *3.
[32] *Id.* at *4.

exhibit 2 was "not so clearly constructed as to present its contents in a way…[in which] the Court could, without more, hold that the checkpoint was proper."[33]

Here, as in *Hollinger*, the State presented (1) the testimony of Chief Capriglione, (2) the Approval Memorandum, and (3) the raw data on which the Approval Memorandum is purportedly based, as evidence of careful compliance with the Checkpoint Procedures. However, although the State complied with the *Hollinger* court's suggestion that the State present the testimony of the officer who supervised the checkpoint,[34] Chief Capriglione was unable to testify substantively about the raw data which supports the Checkpoint's establishment. Moreover, there was no way the Court on its own could ascertain from the raw data the corresponding statistics that went into the Approval Memorandum. In other words, the Court has no basis of knowing whether the information set forth in the raw data correlates to the statistics that serve as the basis for the Approval Memorandum and corresponding checkpoint location.

The State has not demonstrated that the checkpoint complied with the statistical qualifiers set forth in the Checkpoint Procedures. Without more, the Court cannot rely on the Approval Memorandum or its corresponding statistics. Therefore, the Court finds that the Checkpoint was not established pursuant to applicable law or established rules, regulations and guidelines. Accordingly, Tew's motion to suppress all evidence gathered at the Checkpoint is **GRANTED**.

---

[33] *Id.* at *7.
[34] *Id.* at *8.

9

## ORDER

For the foregoing reasons, Defendant Richard L. Tew's Motion to Suppress is **GRANTED.**

**IT IS SO ORDERED this 6th day of July, 2015.**

Sheldon K. Rennie,
Judge

10